1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    SENARBLE CAMPBELL,                    Case No. 21-cv-05187-JST

8                  Plaintiff,
                                           ORDER DENYING DEFENDANTS'
9         v.                               MOTION TO STRIKE; GRANTING
                                           DEFENDANTS' MOTION FOR
10   M. CALLIS, et al.,                     SUMMARY JUDGMENT

11                Defendants.              Re: ECF Nos. 33, 39

12

13        Plaintiff filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against

14   correctional officials at Salinas Valley State Prison, where he was previously housed.  ECF Nos. 1,

15   8.  Now pending before the Court is Defendants' motion for summary judgment.  ECF No. 33.

16   Plaintiff has filed an opposition, ECF No. 36, and Defendants have filed a reply, ECF No. 38.

17   Defendants have also filed a motion to strike the exhibits which Plaintiff filed in support of his

18   opposition, ECF No. 39, and Plaintiff has filed an opposition to the motion to strike, ECF No. 40.

19   For the reasons set forth below, the Court denies Defendants' motion to strike, ECF No. 39, and

20   grants Defendants' motion for summary judgment, ECF No. 33.

21                                    **BACKGROUND**

22        The following facts are undisputed unless otherwise noted.

23        During the relevant time period, Plaintiff was housed at Salinas Valley State Prison

24   ("SVSP") and all defendants were SVSP correctional officers or staff.

25        Plaintiff participates in the California Department of Corrections and Rehabilitation

26   ("CDCR")'s Mental Health Services Delivery System ("MHSDS") at the Enhanced Outpatient

27   Program Level of Care ("EOP").  Inmates enrolled in EOP are considered to have severe mental

28   health issues that render them unable to care for themselves in a general population setting.  ECF

United States District Court
Northern District of California

No. 36-1 at 2.  Since Plaintiff's incarceration began in 1997, Plaintiff has alternated between EOP and Correctional Clinical Care Management System ("CCCMS") levels of care.  These two levels of care are the most intensive forms of mental health care provided by the CDCR.  ECF No. 36-1 at 3.

Defendant Callis is a contract psychologist and, during the relevant time period, provided direct services to inmate patients in the Administrative Segregation Unit ("ASU") and participated in Institutional Classification Committee ("ICC") hearings when necessary to evaluate an inmate's mental health factors for the committee's consideration.  Defendant Callis served as Plaintiff's primary clinician from April 30, 2018 to May 3, 2018.  Defendant Callis evaluated or observed Plaintiff daily from April 27 through May 3, 2018.  Defendant Callis also attended Plaintiff's May 3, 2018 ICC meeting that reviewed Plaintiff's placement in ASU in his capacity as a mental health clinician.  Defendant Callis had no other in-person interactions with Plaintiff.  ECF No. 33-7 ("Callis Decl.") ¶¶ 1-13.

Defendant Swearengin is a senior psychologist.  In this role, she supervised the daily and ongoing activities of mental health clinicians and support staff; provided direct services to inmate patients; and participated in Unit Classification Committee ("UCC") hearings when necessary to evaluate an inmate's mental health factors for the committee's consideration.  From July 2013 through May 30, 2018, defendant Swearengin also served as clinical psychologist for the Suicide Prevention Response Focus Intervention Team ("SPR FIT").  The primary objective of SPR FIT was to prevent inmate deaths from suicide by ensuring the implementation of and compliance with all CDCR policies related to suicide prevention and response.  Defendant Swearengin appeared at Plaintiff's June 26, 2018 UCC meeting to provide input regarding Plaintiff's move to general population.  Defendant Swearengin had no other in-person interactions with Plaintiff.  ECF No. 33-5 ("Swearengin Decl.") ¶¶ 1-4, 7-10.

Defendant Hatton is the warden, and defendant Aguilera is a classification and parole representative ("C&PR").  ECF No. 33-9 ("Hatton Decl.") ¶ 1; ECF No. 33-4 ("Aguilera Decl.") ¶ 1.  Defendants Hatton and Aguilera attended the May 3, 2018 ICC meeting that performed the initial review of Plaintiff's April 27, 2018 placement in ASU for committing a battery on a peace

officer.  Defendant Hatton chaired the meeting and defendant Aguilera served as recorder.  In his capacity as recorder, defendant Aguilera prepared the case for hearing, reviewed Plaintiff's case factors, and made a recommendation as to whether to retain Plaintiff in ASU.  Defendants Hatton and Aguilera had no other in-person interactions with Plaintiff.  Hatton Decl. ¶¶ 2-7; Aguilera Decl. ¶¶ 2-8.

Defendant Thomas is a captain; defendant Godinez is a correctional counselor II supervisor ("CCII"); and defendant Gamboa is a correctional counselor I ("CCI").  ECF No. 33-8 ("Thomas Decl.") ¶ 1; ECF No. 33-3 ("Godinez Decl.") ¶ 1; ECF No. 33-6 ("Gamboa Decl.") ¶ 1. Defendants Thomas, Godinez, and Gamboa attended the June 26, 2018 UCC meeting that performed the initial review of Plaintiff's move to general population.  Defendant Thomas chaired the committee meeting, defendant Godinez served as recorder for the meeting, and defendant Gamboa served as a staff assistant.  In his capacity as staff assistant, defendant Gamboa met with Plaintiff on June 20, 2018, and was present at the meeting to ensure that Plaintiff understood the purpose of the meeting and to answer any of Plaintiff's questions about the hearing or the committee's decision.  Defendant Gamboa did not present any information to the committee and had no involvement in any of the committee's decisions, including the decision to establish double-cell occupancy for Plaintiff.  Defendants Thomas, Godinez, and Gamboa had no other in-person interactions with Plaintiff.  Thomas Decl. ¶¶ 2-6; Godinez Decl. ¶¶ 2-6; Gamboa Decl. ¶¶ 2-5.

**I.      Plaintiff's Single Cell Status from August 2008 to July 2018.**

Plaintiff received rules violation reports ("RVRs") dated March 2, April 7, and August 19, 2005, for threatening to kill any cellmate with which he might be housed.  ECF No. 33-5 at 7. Because of these threats, Plaintiff was placed on single-cell status in August 2008 and retained in single-cell status until the relevant events in June 2018.  ECF No. 33-5 at 7.  In a response to a grievance dated September 23, 2013, Plaintiff wrote: "So therefore for me to kill or try to kill, rape or try to rape any future cellmate isn't an issue; (WHEN) is the question.  I have dreams of raping and killing a cellmate as well as fantasize about it often."  ECF No. 33-5 at 7.  Plaintiff has no record of predatory behavior or in-cell violence.  ECF No. 33-5 at 7.

United States District Court
Northern District of California

**II.      Plaintiff's History of Suicide Attempts (January 1, 1986; January 1, 2008; and October 30, 2017)**

Plaintiff has attempted suicide at least three times.

Plaintiff first attempted suicide attempt on January 1, 1986 by jumping.  If Plaintiff had not been discovered, he would have died.  On a medical severity scale of 1 to 4, with 4 being the most severe, the suicide attempt was classified as 4.  Plaintiff required hospitalization and intensive medical/surgical management.  ECF No. 33-5 at 12.

Plaintiff's second suicide attempt was on January 1, 2008, when Plaintiff set his cell on fire with the intent to die.  If Plaintiff had not been discovered, he would have died.  On a medical severity scale of 1 to 4, the suicide attempt was classified as 2, with Plaintiff's injuries described as minor or superficial.  ECF No. 33-5 at 12.

His third suicide attempt was on October 30, 2017, when Plaintiff went on a seven-day hunger strike.  If Plaintiff had not been discovered, he would have died.  On a medical severity scale of 1 to 4, the attempt was classified as 4, with Plaintiff requiring hospitalization and intensive medical/surgical management.  ECF No. 33-5 at 10, 12.

On October 31, 2017, Plaintiff stated that he does not keep track of how many suicide attempts he has made: "There has been a lot.  It just depends on the situation."  ECF No. 33-7 at 10.  Plaintiff also stated that he prompted a 2015 cell extraction as an attempt to get correctional officers to kill him.  *Id.*  He also stated that he set his cell on fire in 2008.  *Id.*

**III.     April 27 – May 3, 2018:  Placement in ASU and Mental Health Evaluations**

Plaintiff states that defendant Callis did not conduct suicide risk evaluations on April 30 or May 1, 2018.  ECF No. 36-1 at 7.

**April 27, 2018.**  On April 27, 2018, Plaintiff was placed in the Administrative Segregation Unit ("ASU") for committing a battery on a peace officer, and an RVR was issued for the battery.  Hatton Decl. ¶ 3 (ECF No. 33-4 at 19).  After being placed in ASU, Plaintiff requested to be seen by the licensed technician ("LT").  When Plaintiff was told that the LT was not available, he threatened to break the glass window and then did so.  Plaintiff stated that he broke the window due to hearing voices, but he could not articulate what the voices were saying.  Plaintiff further

4

stated, "I was just trying to get out of the cell away from the voices." Defendant Callis interviewed Plaintiff. In the interview, Plaintiff stated that he had both suicidal and homicidal ideations and planned to commit suicide by correctional officer; asked to see his clinician; accused defendant Callis of being a "social worker correctional officer"; reported his history of being at SVSP; and stated that he knew the system and how correctional officers work. Defendant Callis reported that Plaintiff was "never able to define his [suicidal ideations] clearly . . . and would not elaborate on triggers; continuing to present more agitated and irritated with [Callis] . . ." ECF No. 33-7 at 22. After consulting with Dr. Borba and additional staff, defendant Callis cleared Plaintiff to return to his housing. Defendant Callis concluded that Plaintiff was in control of his behaviors, based on his observations that Plaintiff did not appear to be decompensating and did not consistently exhibit uncontrolled manic or psychotic behaviors. When Plaintiff was informed that he would be returned to his housing, Plaintiff presented as relaxed and responded, "okay," with no further statements of suicidal or homicidal ideations. ECF No. 33-7 at 22.

**April 28, 2018.** On April 28, 2018, medical staff reported that Plaintiff was standing in his cell, screaming at high volume that he was both suicidal and homicidal, but medical staff observed that Plaintiff was not attempting to hurt himself in any way. Medical staff observed a sheet and rope hanging in the cell. But medical staff also noted that the sheet appeared more like a cell partition than a setup for committing suicide or homicide, and that the rope appeared to be attached to the wall and not the ceiling. When defendant Callis approached Plaintiff's cell, Plaintiff turned on the light and stated, "I am suicidal/homicidal and I shouldn't have to break the window to make that point. I have said it since last night." After taking down defendant Callis' name, Plaintiff stated, "O.K. I am now going to kick it. I already made my point." Plaintiff then turned off the light and Callis assumed he went to bed. Defendant Callis concluded that Plaintiff's behavior appeared to be behavior and goal-oriented and was not consistent with suicidality or homicidality; and that Plaintiff should be discharged. Defendant Callis suggested to correctional officers that the sheet and rope be removed from Plaintiff's cell and that Plaintiff be provided with a safety mattress instead. Correctional officers responded that it would be difficult to remove these items given Plaintiff's assaultive behavior upon staff the day prior. ECF No. 33-7 at 9.

**April 29, 2018.**  On April 29, 2018, Plaintiff threw his cane at a staff worker, with the cane hitting the wall of the cage; refused to come back from the yard; and, while at yard, screamed loudly to a large inmate audience that he was suicidal and homicidal.  ECF No. 33-7 at 12, 14. Plaintiff did not directly report the suicidal and homicidal ideations to clinical staff.  ECF No. 33-7 at 12.  In response, prison psychologist Dorit Ilani evaluated Plaintiff for suicide risk and self-harm.  During the evaluation, Plaintiff reported having suicidal ideations in the past, having considered suicide in the past month by conducting a hunger strike, and hoping that the guards would attack him after he broke out the windows in his cell; but denied having worked out details to kill himself or intending to carry out any plan for suicide.  ECF No. 33-7 at 14.  Prior to speaking with Plaintiff, defendant Callis consulted with Sergeant Borrosso, who reported implementing a behavior modification strategy whereby Plaintiff's cell was emptied of personal belongings, including the mattress and TV, and Plaintiff was informed that his belongings would be returned if he cooperated.  When defendant Callis arrived to speak with Plaintiff, Plaintiff yelled twice, "B**ch, I already talked to [you] yesterday, I don't need to talk to [you] today, you are incompetent, go bring me someone else."  Defendant Callis left the yard.  Plaintiff did not report any suicidal or homicidal tendencies to defendant Callis.  After defendant Callis left the yard, Plaintiff agreed to return to his cell without incident and to cooperate.  Plaintiff's belongings were then returned to him.  Based on these events, defendant Callis concluded that Plaintiff's behavior was driven by behavioral strategies for secondary gain and inconsistent with suicidal and homicidal behavior.  ECF No. 33-7 at 8.

**April 30, 2018.**  On April 30, 2018, Plaintiff informed the psych tech that he was suicidal and homicidal, and submitted a Health Care Services Request Form (CDC Form 7362), stating that he felt suicidal.  ECF No. 33-7 at 7-8; ECF No. 36-2 at 16.  The psych tech described Plaintiff as "hostile and uncooperative" and refusing to explain what was going on.  Plaintiff was overheard telling an officer that he wanted to be moved to the Correctional Treatment Center and did not understand why he did not get to go.  Defendant Callis attempted to interview Plaintiff in the holding cell, but Plaintiff told defendant Callis to "get the fuck away" and that he did not want anything.  ECF No. 33-7 at 7-8.

United States District Court
Northern District of California

**May 1, 2018.**  On May 1, 2018, Plaintiff informed correctional staff that he was having suicidal and homicidal thoughts.  ECF No. 1 ("Compl.") at 5; Dkt. No. 33-7 at 16.  Plaintiff reports that he was taken to a holding cell in the rotunda.  Compl. at 5.  Medical records dispute this, stating that Plaintiff refused to be pulled from his cell and remained in his cell, and that Plaintiff was assessed in this cell.

Defendant Callis arrived to assess Plaintiff.  Plaintiff informed defendant Callis that he was having suicidal and homicidal thoughts, and, Plaintiff alleges, defendant Callis asked Plaintiff, "If you're suicidal, how is that you're still alive?  What are you trying to achieve?"  Compl. at 6; ECF No. 36-1 at 3.  Defendant Callis denies asking these questions.  Defendant Callis states that he asked the questions contained in the Suicide Risk and Self-Harm Evaluation,[1] which were aimed at evaluating Plaintiff's risk of suicide; and asked questions about Plaintiff's history of self-harm.[2] Defendant Callis concluded that Plaintiff's suicidal ideations did not seem sincere, and that Plaintiff appeared "to enjoy making statements to disrupt the functioning of the institution and behaving aggressively, verbally and physically, towards staff."  Callis Decl. ¶ 8 and Ex. B (ECF No. 33-7 at 3, 16, 21).  Plaintiff told defendant Callis to "fuck off" and "get the fuck away" from him.  Defendant Callis reports that Plaintiff rejected continued contact with Callis.  ECF No. 33-7 at 16.

---

[1] The questions in Suicide Risk and Self-Harm Evaluation are:
   (1) Have you wished you were dead or wished you could go to sleep and not wake up in the past month?
   (2) Have you actually had any thoughts of killing yourself in the past month?
   (3) Have you been thinking how you might do this in the last month?
   (4) Have you had these thoughts and some intention of acting on them in the past month?
   (5) Have you started to work out or worked out the details of how to kill yourself in the last month?
   (6) Do you intend to carry out this plan?
Callis Decl. ¶ 9 (ECF No. 33-7 at 3).
[2] The questions regarding Plaintiff's history of self-harm included the following questions:
   (1) Have you engaged in self-harm without intent in the past 3 months?
   (2) Has there been a time when you started to do something to end your life but someone stopped you before you actually did anything in the past 3 months?
   (3) Has there been a time when you started to do something to try to end your life but you stopped yourself before you actually did anything in the past 3 months?
   (4) Have you taken any steps toward making a suicide attempt or preparing to kill yourself in the last 3 months?
Callis Decl. ¶ 10 (ECF No. 33-7 at 3).

That same day, Defendant Callis observed Plaintiff jump off his bunk bed, rush to the door, and bang the window with his cane. ECF No. 36-2 at 14. Defendant Callis suggested to the psych tech that Plaintiff's PCP change Plaintiff's KOP (keep on person) medications – blood pressure medications – to DOT (daily observed therapy), given Plaintiff's erratic and self-harm threatening behaviors. ECF No. 36-2 at 14.

**May 2, 2018.** On May 2, 2018, Plaintiff broke out the cell door window while defendant Callis stood watching. Plaintiff again told defendant Callis that he was suicidal and homicidal. Defendant Callis left. Compl. at 6; ECF No. 36-1 at 3.

**May 3, 2018.** On May 3, 2018, in response to unwanted voices, Plaintiff cut his left arm. Defendant Callis was aware of these cuts because he saw them. Compl. at 6; ECF No. 36-1 at 3.

## IV.     May 3, 2018 ICC Meeting

On May 3, 2018, an ICC meeting was held to conduct an initial review of Plaintiff's April 27, 2018 ASU placement. Defendant Hatton chaired this meeting and defendant Aguilera attended as a recorder. As a recorder, defendant Aguilera was responsible for preparing the case for hearing, reviewing Plaintiff's case factors, and making a recommendation as to whether to retain Plaintiff in ASU. Because Plaintiff participates in the Mental Health Services Delivery System at the Enhanced Outpatient Program ("EOP") level of care, Plaintiff's clinician, defendant Callis, was also present at the hearing to address Plaintiff's mental health factors so that the ICC could consider these factors in making its decision. Hatton Decl. ¶¶ 2-4 and Ex. A (ECF No. 33-9 at 2, 4-8); Aguilera Decl. ¶¶ 3-5 and Ex. B (ECF No. 33-4 at 2, 17-21); Callis Decl. ¶ 12 and Ex. C (ECF No. 33-7 at 3-4, 24-28).

Plaintiff states that he showed the cuts on his arms to defendants Hatton, Callis, and Aguilera, and was placed in the holding cage as a result. Plaintiff denies being disruptive or confrontational at the meeting, and denies being removed from the meeting as a result. ECF No. 36 at 10; ECF No. 36-1 at 3. Plaintiff further states that he informed defendant Callis that he was having unwanted suicidal and homicidal ideations, yet defendant Callis sent him back to his cell without addressing these troubling ideations. Compl. at 7; ECF No. 36 at 3; ECF No. 36-1 at 3. Plaintiff's medical records also state that Plaintiff reported suicidal and homicidal ideations during

the ICC meeting.  ECF No. 33-5 at 15.  Defendants Aguilera and Hatton deny Plaintiff's claim that he expressed suicidal and homicidal thoughts at the hearing, stating that they have no recollection of Plaintiff making such statements.  Aguilera Decl. ¶ 6 (ECF No. 33-4 at 2); Hatton Decl. ¶ 5 (ECF No. 33-9 at 2), Callis Decl. ¶ 13 (ECF No. 33-7 at 4).  In a June 14, 2018 interview with a social worker, Plaintiff denied expressing suicidal and homicidal intentions at this meeting.  ECF No. 33-5 at 15.  Defendants state that Plaintiff was removed from the hearing because he was disruptive and confrontational.  Aguilera Dec. ¶ 6 and Ex. B (ECF No. 33-4 at 2, 17-21); Hatton Decl. ¶ 5 and Ex. A (ECF No. 33-9 at 2, 4-8).

The hearing proceeded in Plaintiff's absence.  Aguilera Dec. ¶ 6 and Ex. B (ECF No. 33-4 at 2, 17-21); Hatton Decl. ¶ 5 and Ex. A (ECF No. 33-9 at 2, 4-8); Callis Decl. ¶ 12 and Ex. C (ECF No. 33-8 at 4, 24-28).  The ICC decided to extend Plaintiff's placement in ASU pending the outcome of the RVR for battery on a peace officer and referral to the Monterey County District Attorney's Office for possible felony prosecution.  The ICC also decided to continue Plaintiff's single cell status, noting that while Plaintiff did not have a significant history of in-cell violence, predatory behavior, and/or victimization concerns, he had an extensive disciplinary history of threatening to kill his cellmate.  Aguilera Decl. ¶¶ 7-8 and Ex. B (ECF No. 33-4 at 2-3, 17-21); Hatton Decl. ¶¶ 6, 7 (ECF No. 33-9 at 2, 4-8; Callis Decl. ¶ 12 and Ex. C (ECF No. 33-8 at 4, 24-28).

**V.    May 4, 2018 to June 25, 2018: Mental Health Assessments**

Because Plaintiff expressed negative feelings towards defendant Callis, Plaintiff was reassigned away to Dr. Weir as his primary clinician for the remainder of his placement at SVSP.  ECF No. 36-2 at 4; Callis Decl. ¶ 4 (ECF No. 33-7 at 2).

On May 4, 2018, Plaintiff was seen by senior psychologist Mahan.  Dr. Mahan reports that he was conducting a mental health assessment.  ECF No. 33-7 at 30-31.  Plaintiff states that the evaluation was for the sole purposes of an RVR.  ECF N. 36 at 11.  Dr. Mahan determined that Plaintiff appeared stable and did not exhibit any signs of a mental health crisis.  Dr. Mahan concluded that there did not appear to be a substantial risk of decompensation should Plaintiff be assessed a term in ASU, as long as Plaintiff retained ongoing access to mental health services.

1    ECF No. 33-7 at 30-31.

2         On May 23, 2018, Plaintiff submitted a Form 7362, Health Care Services Request Form,

3    stating that he was still having "unwanted thoughts."  ECF No. 36-2 at 24.

4         On June 8, 2018, Plaintiff was seen by senior psychologist Lickiss.  Dr. Lickiss reported

5    that Plaintiff presented as stable, with no indications of acute distress or decompensation, and that

6    he did not endorse any suicidal or homicidal ideations.  ECF No. 33-5 at 18.

7         On June 14, 2018, in response to Plaintiff's reports of homicidal and suicidal ideations at

8    his ICC Meeting, Plaintiff was seen by social worker Thoung.  Thuong reported that Plaintiff

9    stated that he never made reports of suicidal ideations, that he has thoughts of harming others, that

10   he has no current homicidal ideations; and that at the ICC he complained about having primarily

11   RT groups.  ECF No. 33-5 at 15.

12   **VI.    June 26, 2018 UCC Meeting**

13        On June 26, 2018, a UCC hearing was held to conduct an initial review of Plaintiff's move

14   to general population.[3]  Defendant Thomas served as chairperson, defendant Godinez served as

15   recorder, defendant Gamboa was present as a staff assistant, and defendant Swearengin was

16   present as a mental health clinician to address mental health related factors for the committee's

17   decision.  Defendant Swearengin recommended double-cell occupancy to ensure Plaintiff's safety

18   and well-being for the following reasons.  Defendant Swearengin believed that the potential

19   dangers associated with double-celling Plaintiff were less than the significant risks of suicide that

20   he had attempted.  Double-celling has been shown to reduce the opportunities for acting on

21   suicidal impulses and increase the possibility of interrupting such actions.  Her examination of

22   Plaintiff's electronic health record showed a history of threatening to kill any cellmate assigned to

23   his cell but showed no history of violence within the cell and showed that Plaintiff had attempted

24   suicide multiple times using lethal methods.  The UCC decided to establish double-cell occupancy

25

26   [3] Plaintiff disputes this characterization of the purpose of the June 6, 2018 meeting, arguing that
     the meeting was to evaluate his release from orientation to EOP, as stated in the Committee Action
27   Summary.  ECF No. 36 at 11 (referencing ECF No. 33-5 at 7).  However, release to EOP is
     effectively a release to general population, as all EOP programs became non-designated
28   programming facilities as of January 8, 2018, meaning that both general population ("GP") and
     special needs yard ("SNY") inmates would now house and program together.  ECF No. 33-5 at 7.

for Plaintiff.  Plaintiff informed the UCC that he did not agree with change in celling status and told the committee members, "Put a person in the cell and there'll be problems."  Plaintiff reiterated that he would kill or rape any cellmate.  When defendant Swearengin told Plaintiff that a cellmate would be better for him given his recent suicide attempts, Plaintiff responded that he no longer had to focus on killing himself, he could now focus on killing his cellmate.  Defendant Thomas informed Plaintiff that he had made a similar statement in 2015 and now it was 2018, and reminded Plaintiff that there would be consequences if he refused a cellmate.  Plaintiff did not express suicidal ideation, intent, or plan at this UCC hearing.  Compl. at 8-9; ECF No. 36-1 at 3-4; Thomas Decl. ¶¶ 2-6 and Ex. A (ECF No. 33-8 at 2, 5-9); Godinez Decl. ¶¶ 2-6 and Ex. A (ECF No. 33-3 at 2, 4-9); Gamboa Decl. ¶¶ 2-5 and Ex. B (ECF No. 33-6 at 2, 7-11); Swearengin Decl. ¶¶ 7-10 and Exs. A, C (ECF No. 33-5 at 3, 5-10, 13-15).

**VII.   June 27, 2018 to August 1, 2018**

On or about June 25 or 27, 2018, Plaintiff submitted a CDCR Form 22 addressed to defendant Godinez, stating that he disagreed with the double-cell occupancy decision, that he would kill or rape any future cellmate, and that there was extensive documentation of this intent. Compl. at 9, ECF No. 36-3 at 6.  Defendant Godinez states that he has no recollection or record of receiving this Form 22.  Godinez Decl. ¶ 7 (ECF No. 33-3 at 2).  Plaintiff alleges that this Form 22 was forwarded to Sgt. Ramey, Compl. at 9, but the record indicates that it was the June 28, 2018 Form 22 addressed to defendant Aguilera that was seen by Sgt. Ramey, ECF No. 36-3 at 15-16.

On June 28, 2018, Plaintiff submitted a CDCR Form 22 addressed to defendant Aguilera, with the same content as the Form 22 submitted to defendant Godinez.  Compl. at 10; ECF No. 36-3 at 19.  This Form 22 was forwarded to Sgt. Ramey, who issued Plaintiff a rules violation report for behavior which could lead to violence.  ECF No. 36-3 at 15-16.  Defendant Aguilera responded to this Form 22 on July, 5, 2018, stating that the UCC conducted a thorough housing review, the UCC noted that Plaintiff had no history of predatory behavior or in-cell violence, and that the housing review was conducted per departmental housing policy.  ECF No. 36-3 at 19.  Plaintiff sought a supervisor review on July 12, 2018, stating that he was giving notice of his homicidal intentions, and that correctional staff was being deliberately indifferent to Plaintiff's

safety and security. *Id.*

On June 28, 2018, Plaintiff submitted a CDCR Form 22 addressed to defendant Thomas, with the same content as the Form 22 submitted to defendants Godinez and Aguilera. Compl. at 10; ECF No. 36-3 at 4. Defendant Thomas states that he has no recollection or record of receiving this Form 22. Thomas Decl. ¶ 7 (ECF No. 33-8 at 2). Plaintiff received no response from defendant Thomas. Compl. at 11.

On July 1, 2018, Plaintiff submitted a CDCR Form 22 addressed to defendant Hatton, with the same content as the Form 22 submitted to defendants Godinez, Aguilera, and Thomas. Compl. at 11; ECF No. 36-3 at 2. Defendant Hatton states that he has no recollection or record of receiving this Form 22. Hatton Decl. ¶ 10 (ECF No. 33-9 at 3). Plaintiff received no response from defendant Hatton. Compl. at 11.

Plaintiff filed a grievance disagreeing with the UCC's decision to double-cell him. On July 12, 2018, defendant Aguilera communicated with Plaintiff's primary clinician, Dr. Saunders, for a mental health consultant to determine whether there were grounds for a mental health recommendation for single cell status. Defendant Aguilera reported to Dr. Saunders that Plaintiff claimed to suffer from homicidal thoughts to kill and sodomize any cellmate that he gets. Dr. Saunders reviewed Plaintiff's September 2, 2010 ASU Pre-Placement Chrono (CDC Form 128-MH7), July 21, 2011 Mental Health Evaluation (CDC Form 7386), August 13, 2017 Mental Health Treatment Plan (CDC Form 7388), and the June 21 and July 10, 2018 psychiatric and Mental Health Placement Chronos ("MHPC"). Dr. Saunders concluded that Plaintiff's suicidal ideations and threats of violent behavior were "either not related to any mental disorder other than personality disorders or involved significant impulsivity or behavior related to secondary gain" and "there was not grounds for mental health recommendations for single cell status at this time." Aguilera Decl. ¶ 12 and Ex. D (ECF No. 33-4 at 3, 28-29).

On July 20, 2018, defendant Aguilera interviewed Plaintiff in connection with his grievance challenging the UCC decision to establish double-cell occupancy (Grievance No. SVSP-L-18-04094). Plaintiff informed defendant Aguilera that he had homicidal thoughts to kill and sodomize any inmate placed in his cell. That same day, SVSP associate warden T. Foss issued a

second level response to this grievance, denying Plaintiff's request to have single cell status

reinstated.  The response noted that Plaintiff had a history of making these same homicidal

allegations; that a July 12, 2018 mental health evaluation found no mental health basis for single

cell status; that Plaintiff had no history of predatory behavior or in-cell violence; and that mental

health recommended double-cell housing due to multiple suicide attempts.  ECF No. 36-3 at 20.

**VIII.   August 2, 2018 Assault on Cellmate and August 9, 2018 ICC Meeting**

On August 1, 2018, Plaintiff was assigned a cellmate, inmate Haun.  Early on the morning

of August 2, 2018, Plaintiff assaulted Haun with his hotpot and the fan; took his cane and broke

the cell door windows; poured baby powder all over his head, face and body; and told inmate

Haun to get on the door and call for the guards.  Compl. at 13.  Plaintiff was initially sent to the

Correctional Treatment Center, and then eventually sent back to his cell.  Plaintiff was not

admitted to the Mental Health Crisis Bed Unit.  Soon thereafter Plaintiff was sent to ASU.  Compl.

at 13-14.  Plaintiff states that the placement in ASU caused his mental health to spiral downwards,

resulting in him being extracted from his cell, breaking out cell door windows, cutting himself,

and being placed on suicide watch.  ECF No. 36-1 at 7.

**DISCUSSION**

**I.     Defendants' Motion to Strike (ECF No. 39)**

Defendants request that the Court strike the exhibits submitted by Plaintiff in support of his

opposition to the summary judgment motion (Exs. A-L, docketed at ECF Nos. 36-2, 36-3).

Defendants object to these exhibits on the grounds that Plaintiff has not laid the proper foundation

for these exhibits and that Plaintiff has not authenticated these records or otherwise demonstrated

that these records are unaltered.  ECF No. 39.  Plaintiff argues that the Court has a duty to

construe his *pro se* pleading liberally; that his evidence is admissible at the summary judgment

stage; that the Court must refrain from credibility determinations at the summary judgment stage;

and that his exhibits are relevant.  ECF No. 40.[4]

---

[4] In his opposition, Plaintiff also argues that Defendants' objections are frivolous and requests that the Court sanction Defendants from filing the motion to strike.  Fed. R. Civ. P. 11(c)(2) requires that a motion for sanctions be made separately from any other motion, and the Court denies the motion on that basis.  Fed. R. Civ. P. 11(c)(2).  In any event, Defendants' motion to strike is not

United States District Court
Northern District of California

1    Exhibits A-L consist of the following: Grievance No. SVSP HC 18001532; May 1, 2018

2  Mental Health Documentation authored by defendant Callis; CDC Form 7362s (Request for

3  Healthcare Services) dated May 4, May 9, May 12, May 23, June 2, and July 20, 2018; Grievance

4  No. SVSP-18-04904; a January 11, 2016 letter from the Officer of Inspector General; a June 4,

5  2009 letter from SVSP Warden Hedgpeth to P. Michael Pekin regarding Plaintiff's single cell

6  status and mental health treatment; a July 18, 2010 Order and Decision on Petition for Involuntary

7  Medication issued in C No. 2010070168 by the Office of Administrative Hearings; a September

8  23, 2013 Request for Psychiatric Consultation submitted by A. Molina; an October 23, 2014 Order

9  in C No. F070077 in the California Court of Appeals, Fifth Appellate District; July 1, 2018 CDC

10  Form 22 (Inmate Request) addressed to S. Hatton; June 28, 2018 CDC Form 22 addressed to M.

11  Thomas; June 27, 2018 CDC Form 22 addressed to B. Godinez; Grievance No. SVSP-L-18-05122

12  and the related second and third level responses; June 28, 2018 CDC Form 22 addressed to M.

13  Thomas; Rules Violation Report Log No. 5210846; June 28, 2018 CDC Form 22 addressed to H.

14  Aguilera and related July 5, 2018 response from Aguilera; second level response to Grievance No.

15  SVSP-L-18-4094; July 28, 2023 declaration from Joseph Ware; May 4, 2018 Mental Health

16  Assessment prepared by psychologist Richard Mahan; Grievance No. SVSP SC-18000134 and

17  related responses; August 2, 2018 CDC Form 7219 Medical Report of Injury or Unusual

18  Occurrence for Plaintiff; August 2, 2018 CDC Form 7219 Medical Report of Injury or Unusual

19  Occurrence for M. Haun; a September 21, 2018 Release Note; and June 26, 2018 Mental Health

20  Documentation authored by defendant Swearengin regarding the June 26, 2018 UCC meeting.

21    Defendants' motion to strike is denied.  The Ninth Circuit has held that the procedural

22  requirements imposed on ordinary litigants at summary judgment do not apply as stringently to

23  prisoner pro se litigants. In *Thomas v. Ponder*, 611 F.3d 1144 (9th Cir. 2010), district courts were

24  cautioned to "construe liberally motion papers and pleadings filed by pro se inmates and . . . avoid

25  applying summary judgment rules strictly."  *Id*. at 1150.  The Ninth Circuit also has observed that

26  "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form.

27

28

---

clearly frivolous and therefore does not support the imposition of Rule 11 sanctions.

We instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made admissible at trial may be considered on summary judgment); *see also Aholelei v. Hawaii Dept. of Public Safety*, 220 F. App'x 670, *1 (9th Cir. 2007) (district court abused its discretion in not considering plaintiff's evidence at summary judgment, "which consisted primarily of litigation and administrative documents involving another prison and letters from other prisoners" that could have been made admissible at trial through other inmates' trial testimony).  Many of the exhibits filed at Exhibits A-L are prison records and can be authenticated by prison officials.  Some of the exhibits were submitted by Defendants themselves in support of their summary judgment motion.  Defendants' motion to strike is particularly poorly taken with respect to these exhibits.  Furthermore, nothing in the record suggests that Exhibits A-L were altered or otherwise lack authenticity, or that these exhibits would not be admissible at trial.

## II.    Summary Judgment Motion

### A.    Summary Judgment Standard

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and

United States District Court
Northern District of California

1    admissions on file, 'designate 'specific facts showing that there is a genuine issue for trial.'" *See*

2    *id.* at 324 (citing Fed. R. Civ. P. 56(e)).  "A scintilla of evidence or evidence that is merely

3    colorable or not significantly probative does not present a genuine issue of material fact"

4    precluding summary judgment. *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.

5    2000).

6          For purposes of summary judgment, the court must view the evidence in the light most

7    favorable to the non-moving party, drawing all justifiable inferences in that party's favor. *AXIS*

8    *Reinsurance Co. v. Northrop Grumman Corp*., 975 F.3d 840, 844 (9th Cir. 2020).  If, as to any

9    given material fact, evidence produced by the moving party conflicts with evidence produced by

10   the nonmoving party, the Court must assume the truth of the evidence set forth by the nonmoving

11   party with respect to that material fact. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).

12   However, facts must be viewed in the light most favorable to the nonmoving party only if there is

13   a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The court's

14   function on a summary judgment motion is not to make credibility determinations or weigh

15   conflicting evidence. *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017).

16          **B.     Legal Standard for Deliberate Indifference to Serious Medical Needs Claims**

17          Deliberate indifference to a prisoner's serious medical needs violates the Eighth

18   Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S.

19   97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part on*

20   *other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en

21   banc).  A determination of "deliberate indifference" involves an examination of two elements: the

22   seriousness of the prisoner's medical need and the nature of the defendant's response to that need.

23   *See McGuckin*, 974 F.2d at 1059.  A "serious" medical need exists if the failure to treat a

24   prisoner's condition could result in further significant injury or the "unnecessary and wanton

25   infliction of pain." *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104).  A prison

26   official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious

27   harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*,

28   511 U.S. 825, 837 (1994).  The prison official must not only "be aware of facts from which the

United States District Court
Northern District of California

inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm. *See McGuckin*, 974 F.2d at 1060. Under the relevant standard, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844 ("A prison official's duty under the Eighth Amendment is to ensure reasonable safety") (internal quotation marks and citation omitted). To be deliberately indifferent, a prison official must have a subjective "state of mind more blameworthy than negligence," akin to criminal recklessness. *Id.* at 835, 839-40.

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. *See Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that he or she chose this course in conscious disregard of an excessive risk to plaintiff's health. *Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). A claim of medical malpractice or negligence is insufficient to make out a violation of the Eighth Amendment. *See Toguchi*, 391 F.3d at 1060-61.

### C.     Analysis

Defendants argue that they are entitled to summary judgment because there is no evidence that housing Plaintiff in the Administrative Segregation Unit ("ASU") instead of Mental Health Crisis Bed ("MHCB") on or about May 3, 2018, and double-celling Plaintiff put Plaintiff at

1  substantial risk of serious harm; and no evidence that each individual defendant knew of a

2  substantial risk of serious harm to Plaintiff and disregarded it.  *See generally* Dkt. No. 33.

3      The majority of Plaintiff's arguments opposing the summary judgment motion are

4  conclusory, with Plaintiff repeatedly insisting that the decisions to retain him in ASU and to

5  double-cell him constituted deliberate indifference.

6      The evidence that Plaintiff proffers in support of his conclusory assertions are prison

7  records – grievances; summaries of the May 3, 2018 and June 26, 2018 classification meetings;

8  mental health evaluations – reflecting that Plaintiff repeatedly expressed suicidal and homicidal

9  ideations to Defendants and that Plaintiff had a history of being single-celled.  However, these

10  prison records do not raise a triable issue of fact as to whether Defendants violated the Eighth

11  Amendment by retaining him in ASU and double-celling him.  The record indicates that, in

12  making these classification and housing decisions, Defendants relied on in-person evaluations and

13  reviewed Plaintiff's medical and disciplinary history.  In addition, Defendants' conclusions that

14  Plaintiff's expressions of suicidal and homicidal ideations were self-serving, that Plaintiff would

15  not decompensate if housed in ASU, and that Plaintiff could safely be housed with a cellmate were

16  shared by other mental health professionals.  The Court addresses Plaintiff's specific arguments

17  further below.

18      Plaintiff's arguments also rely on mischaracterizations of his health records or the caselaw

19  he cites.  Plaintiff makes the following specific arguments.  Plaintiff argues that Defendants

20  knowingly placed him at substantial risk of serious harm in the following ways:

21      • On May 3, 2018, Defendants elected to retain him in ASU instead of transferring to
22        a Mental Health Crisis Bed, because they were aware that Plaintiff had a lingering
        risk of suicide, which is greater than a generalized risk of suicide.  ECF No. 36 at
23        16-17.

24      • Defendants elected to establish double-cell occupancy for him although double-
        celling does not reduce the risks of acting upon suicidal ideations, citing to
25        *Delgado v. Cady*, 576 F.Supp. 1446, 1457 (E.D. Wis. 1983), ECF No. 36 at 17-18;
        and Dr. Mahan's May 4, 2018 assessment indicated that Plaintiff's mental illnesses
26        contributed to his behavior, *id.* at 19.

27      • Defendant Callis did not conduct suicide risk assessments on April 30 or May 1;
        and asked him why he was still alive after Plaintiff expressed suicidal ideations on
28        May 1, 2018.

- Defendants Callis, Hatton, and Aguilera did not address his expressions of suicidal and homicidal ideations at the May 3, 2018 ICC meeting and merely sent him back to his cell.

- Defendant Swearengin did not personally assess him before recommending that he be double-celled.

- Plaintiff was not placed in a MHCB after his August 2, 2018 assault on his cellmate, inmate Houn, and instead was placed in ASU, which caused his mental health to deteriorate and spiral downward.

None of these arguments raise a reasonable inference that Defendants were aware of a substantial risk of serious harm to Plaintiff if he were housed in ASU or double-celled.

With respect to Plaintiff's argument that Defendants erred in retaining him in ASU and/or sending him back to his cell after he expressed suicidal ideations, Plaintiff has not explained why retention in ASU was medically unacceptable or how a MHCB placement was the only medically acceptable course of action. The record shows that Plaintiff had access to mental health care while housed in ASU, was monitored by correctional staff, and was evaluated frequently by mental health professionals. From April 27 to May 3, 2018, Plaintiff was seen multiple times daily by mental health professionals. From May 4, 2018 to June 26, 2018, Plaintiff was seen four times by mental health professionals. All the mental health professionals who evaluated him during this time – Dr. Callis, Dr. Mahan, Dr. Lickiss, and social worker Thuong – were aware of his prior expressions of suicidal ideation and concluded that, despite these expressions, Plaintiff was stable and could be retained in ASU. ECF No. 33-5 at 15, 18; ECF No. 33-7 at 30-31. The overall conclusion was that while Plaintiff had a chronic risk of endorsing suicide, he did not have an acute risk at that time. ECF No. 33-5 at 17. Although Defendant Callis walked away from Plaintiff's cell, he did so only after attempting to evaluate Plaintiff and Plaintiff reacted to him in a hostile manner and refused to speak with him. Even if defendant Callis did not conduct a formal suicide or self-harm evaluation, it is undisputed that defendant Callis took reasonable steps to address Plaintiff's expressions of suicidal ideations by attempting to evaluate Plaintiff and speaking with other correctional staff about ways to encourage positive behavior and to limit access to self-harm tools. Plaintiff mischaracterizes Dr. Mahan's assessment when he claims that Dr. Mahan concluded that Plaintiff's behavior was caused by his mental health issues. Plaintiff's exhibit does not provide Dr. Mahan's full assessment. In the full assessment, Dr. Mahan

United States District Court
Northern District of California

1    concluded that Plaintiff's antisocial personality disorder and mood disorder were the likely causes

2    of Plaintiff' behavior and that Plaintiff's mental health issues "MAY have contributed to the

3    behaviors . . . but not so strongly that they should be alternatively documented."  ECF No. 33-7 at

4    30 (emphasis in original).

5         With respect to Plaintiff's argument that Defendants knowingly disregarded a substantial

6    risk of serious harm to Plaintiff when they forced him to double-cell, the record indicates that

7    Defendants believed, albeit incorrectly, that Plaintiff could double-cell safely despite Plaintiff's

8    claims to the contrary.  Defendants reasonably relied on mental health assessments that repeatedly

9    concluded that Plaintiff's expressions of suicidal and homicidal ideations were self-serving;

10   Plaintiff's lack of predatory behavior history; and defendant Swearegin's recommendation that it

11   would reduce Plaintiff's opportunity to act on suicidal impulses.  While it turns out that

12   Defendants and the medical staff were incorrect in their assessment as to whether Plaintiff could

13   safely have a roommate, there is nothing in the record from which it can be reasonably inferred

14   that Defendants knew that Plaintiff would assault his cellmate and disregarded this knowledge.

15   The fact that Plaintiff told Defendants that he would harm any future cellmate at the June 26, 2018

16   UCC meeting, via Form 22s, and via a grievance, does not establish Eighth Amendment liability.

17   As previously discussed, notwithstanding his frequent threats, Plaintiff did not have a significant

18   history of in-cell violence, predatory behavior, and/or victimization.  Defendants' prediction that

19   double-celling would be safer for Plaintiff because it would provide a check on potential suicide

20   attempts was grounded in that history.  Also, even if Defendants should have perceived that

21   double-celling Plaintiff might present an unacceptable risk, that is not the conclusion they drew.

22   "In order to know of [an] excessive risk, it is not enough that the person merely 'be aware of facts

23   from which the inference could be drawn that a substantial risk of serious harm exists, [ ] he must

24   also draw that inference.'"  *Gibson*, 290 F.3d at 1188.  That did not occur here.

25        Finally, with respect to Plaintiff's placement in ASU after his August 2, 2018 assault on

26   his cellmate, Plaintiff has not linked any of the defendants directly to this placement decision.

27   Defendant Callis stopped treating Plaintiff after May 3, 2018, and the remaining defendants do not

28   recall interactions with Plaintiff outside of the May 3, 2018 ICC meeting and the June 26, 2018

*United States District Court*
*Northern District of California*

20

meeting.

Below the Court specifically addresses each individual defendant's Eighth Amendment liability.

### 1.     Defendant Callis

Plaintiff argues that defendant Callis violated the Eighth Amendment by failing to properly address Plaintiff's suicidal ideations by, among other things, asking Plaintiff why he was still alive; walking away from Plaintiff's cell after Plaintiff expressed suicidal ideations; returning Plaintiff to his cell after the May 3, 2018 ICC meeting despite Plaintiff's expression of suicidal and homicidal ideations; and not conducting suicide risk assessments on April 30 and May 1. However, as discussed above, it is undisputed that defendant Callis visited Plaintiff daily from April 27 to March 3, 2018; attempted to conduct a general mental health assessment each time; and conferred with other correctional staff about Plaintiff's condition and the appropriate way to approach him.  In addition, defendant Callis' assessment that Plaintiff was not at acute risk for committing suicide was shared by the other mental health professionals who evaluated Plaintiff and was based on Callis' professional evaluation of Plaintiff's history.  Viewing the record in the light most favorable to Plaintiff, there is no triable issue of fact as to whether defendant Callis knew that Plaintiff was at substantial risk of serious harm from his suicidal ideations or as to whether defendant Callis failed to take reasonable steps to abate any risk of serious harm faced by Plaintiff.  The Court grants summary judgment in favor of defendant Callis.

### 2.     Defendant Swearengin

Plaintiff alleges that defendant Swearengin violated the Eighth Amendment when she allowed him to be double-celled because she knew that there was a substantial risk of serious harm to Plaintiff if he was forced to have a cellmate because she was present at the June 26, 2018 UCC meeting when he threatened to harm any future cellmate; and because she erred in her professional assessment that Plaintiff's risk of acting on suicidal impulses would be reduced by double-celling, citing to *Delgado v. Cady*, 576 F.Supp. 1446, 1457 (E.D. Wis. 1983).  ECF No. 36 at 17-18, 20-21.  As discussed above, Plaintiff has not presented evidence from which it can be reasonably inferred that defendant Swearengin knew that Plaintiff would harm his cellmate.  Defendant

Swearengin reports that she believed that Plaintiff was unlikely to carry through on his threats because his threats were generally self-serving with an intent to obtain secondary gain and he had no history of predatory behavior.  At most, defendant Swearengin's incorrect assessment of the likelihood of Plaintiff assaulting his cellmate constitutes negligence.  "Neither negligence nor gross negligence will constitute deliberate indifference."  *Jones v. Henry*, 635 F. Supp. 3d 803, 812 (D. Ariz. 2022) (quoting *Clement v. California Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002).

*Delagdo* is not controlling on this Court and Plaintiff misstates the *Delgado* court's holding.  The *Delgado* court supports defendant Swearengin's professional assessment that double-celling reduces the risk of acting on suicidal impulses.  The focus of *Delgado*'s concern is not the inmate with suicidal ideation, such as Plaintiff, but the non-suicidal inmate who is required to cell with a suicidal inmate:

> There is little question that the presence of another human being in a cell with an inmate who displays suicidal tendencies may discourage suicide.  However, it is cruel and unusual punishment to force an inmate to share a cell with a suicidal person solely to act as a prophylactic agent.  It is the duty of the staff and not the inmates to provide surveillance over suicidal inmates.  Accordingly, the Court will order defendants to devise a new system for evaluating prisoners with psychologic or psychiatric problems prior to double celling them.

*Delgado*, 576 F. Supp. at 1452.  Plaintiff also cites to *Seaton v. Mayberg*, 610 F.3d 530 (9th Cir. 2010), presumably for the proposition that "[t]he Eighth Amendment may entitle a prisoner to protection from a sexually violent predatory roommate whose proclivity to rape his roommate is known to the prison," *id.* at 535.  However, that holding is concerned with the safety of the inmate who is attacked – in this case, inmate Haun – and does not establish the rights of the attacking inmate – in this case, Plaintiff.

Viewing the record in the light most favorable to Plaintiff, there is no triable issue of fact as to whether defendant Swearengin knew that Plaintiff was at substantial risk of serious harm from double-celling or as to whether defendant Swearengin failed to take reasonable steps to abate any risk of serious harm faced by Plaintiff.  The Court grants summary judgment in favor of defendant Swearengin.

### 3. Defendant Hatton and Aguilera.

Plaintiff argues that defendants Hatton and Aguilera violated the Eighth Amendment when they elected to retain him in ASU and sent him back to his cell, and when they allowed him to be double-celled because he expressed suicidal and homicidal ideations at the May 3, 2018 UCC meeting, in Grievance No. SVSP-18-4094, and in Form 22s.  ECF No. 36 at 24-25.  However, as discussed above, defendants Hatton and Aguilera have presented evidence that they believed Plaintiff would not carry out his threats of suicide or assault.  Various mental professionals evaluated Plaintiff and concluded that he was stable and would not decompose while housed in ASU if he had ready access to mental health services, which the record shows that he did.  Plaintiff's medical records indicated that his threats of suicide and homicide were often self-serving; Plaintiff had no history of predatory behavior; defendant Swearengin recommended that he double-cell; and Dr. Sanders found that there was no mental health basis for single cell status.  Viewing the record in the light most favorable to Plaintiff, there is no triable issue of fact as to whether defendants Hatton and Aguilera knew that Plaintiff was at substantial risk of serious harm from being housed in ASU or from double-celling, and there is no triable issue of fact as to whether defendants Hatton and Aguilera failed to take reasonable steps to abate any risk of serious harm faced by Plaintiff.  The Court grants summary judgment in favor of defendants Hatton and Aguilera.

### 4. Defendant Gamboa

Plaintiff argues that defendant Gamboa violated the Eighth Amendment when he allowed the June 26, 2018 UCC to double-cell him because Plaintiff expressed his intent to kill or rape any future cellmate at the June 26, 2018 meeting and because of Grievance No. SVSP-18-4094.  ECF No. 36 at 25-26.  It is undisputed that defendant Gamboa's only in-person interaction with Plaintiff was in his capacity as staff assistant for the June 26, 2018 Unit Classification Committee meeting and that in this capacity, defendant Gamboa did not present any information to the committee, did not participate in decision-making process, and was not involved in the decision to establish double-cell occupancy for Plaintiff.  Moreover, as discussed above, there is no evidence in the record that any of the defendants, much less defendant Gamboa, believed that Plaintiff

would carry out his threat.  Viewing the record in the light most favorable to Plaintiff, there is no triable issue of fact as to whether defendant Gamboa knew that Plaintiff was at substantial risk of serious harm from double-celling or as to whether defendant Gamboa failed to take reasonable steps to abate any risk of serious harm faced by Plaintiff.  The Court grants summary judgment in favor of defendant Gamboa.

### 5.      Defendants Godinez and Thomas

Plaintiff argues that defendants Godinez and Thomas violated the Eighth Amendment when they allowed him to be housed in double-celled because he informed them of his homicidal tendencies at the June 26, 2018 UCC meeting, in Grievance No. SVSP-18-4094, and in Form 22s. ECF No. 36 at 22-25.  As discussed above, there is no evidence in the record from which it can be reasonably inferred that any of the defendants, including defendants Godinez and Thomas, believed that Plaintiff would carry out his threat.  Viewing the record in the light most favorable to Plaintiff, there is no triable issue of fact as to whether defendants Godinez and Thomas knew that Plaintiff was at substantial risk of serious harm from double-celling or as to whether they failed to take reasonable steps to abate any risk of serious harm faced by Plaintiff.  The Court grants summary judgment in favor of defendants Godinez and Thomas.

### 6.      Qualified Immunity

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests — "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability who perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).  The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "'swiftly and firmly'" in situations where the rules governing their actions are often "'voluminous, ambiguous, and contradictory.'" *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citing *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes

United States District Court
Northern District of California

might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.* To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232. Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Because there was no violation of Plaintiff's constitutional rights, as explained above, there is no necessity for further inquiry concerning qualified immunity. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

**CONCLUSION**

For the foregoing reasons, the Court denies Defendants' motion to strike, ECF No. 39, and grants Defendants' motion for summary judgment. ECF No. 33. The Clerk shall enter judgment in favor of Defendants and against Plaintiff and close the case.

This order terminates ECF Nos. 33, 39.

**IT IS SO ORDERED.**

Dated: February 20, 2024

_____
JON S. TIGAR
United States District Judge